I'm going to reserve five minutes for rebuttal, if I may. You may, but you'll have to keep track of your own time. That's the total. Initially, I think the sort of the core factual matter that is the predicate, really, of all the claims in this case are the allegations and then the evidence in the summary judgment motion about the nepotistic relationship between the department head, Ms. Fukai, and her live-in partner, Mr. Yerian, and the consequences that had on the department, not only for the plaintiff, but also the impact it had on other professionals in the department, which were reflected in declarations that we submitted. The perceptions that it created within the department as nepotistic relationships will inherently do so, even if people are scrupulous to try to avoid any influence that it might have. But to have it at such senior levels makes it almost impossible to completely keep it out of the realm of what's happening because of people's perceptions of what's happening. And it's going to be an inevitable perception that the individual who has that relationship, Mr. Yerian, is going to have certain benefits or positioning or opportunities or just a presumption of credibility, various things you can imagine across the board in a management context. Now, in our due process claim, there really were three components, three different aspects to our due process claim, and one of which in the first one that we repeatedly tried to articulate, but apparently I guess I didn't do a good enough job because I not only didn't get a favorable ruling, I didn't seem to be able to even get a direct response. And that is the argument that I made deriving out of the Rutherford case. Now, the Rutherford case itself is a police case, and it became dated to a certain extent once Graham v. Connor came down from the Supreme Court, which said basically that police are governed by the Fourth Amendment, so we don't go to due process, which is supposed to be an umbrella that you only go to. Why don't you just explain your due process theory to us? How was he denied due process? He was psychiatrically, psychologically injured by the conduct of the defendant in the same sense that the injuries were inflicted in Rutherford, except that instead of being a physical injury, it was a psychological injury. And he was seen a psychiatrist. There was discovery done on his psychiatric, psychological injuries. This went way beyond just a mere allegation. But what caused the psychological injury? The isolation and various forms of... Didn't he request to be moved to the branch office? Oh, this started even before that process. Didn't he himself quit the position he's claiming he was constructively... Yeah, but he was already at that point under the care of a doctor. So it wasn't like, you know, the due process claim didn't start in June of 2005. The First Amendment claim started in June of 2005. The due process claim started in 2003, 2004, as the process evolved. I don't get... Actually, that was... Okay, so you're saying he was psychologically injured as of that time, but yet when Fukai was appointed by the supervisors in 2002, she herself was the one who appointed your client as this chief deputy, which is an at-will position. So she appointed him even though... And then he quit that position. And she could have fired him at any time anyway, but then he quit that position. And then he asked to be moved. So I don't understand what his claim is against the APD and the county. Well, first of all, the facts that we have to determine the due process claim is based on the complaint, and not the evidence that was adduced in the summary judgment motion, which was only on the First Amendment claim. So for determining both the due process and equal protection claim, they were dismissed on 12b-6 motions. So the factual predicates on which these claims need to be addressed are what the allegations of the complaint. So we're talking about now facts that are not, for the most part, except you could say the one fact you mentioned is that she appointed him and that he resigned. Now he resigned because basically as time wore on, his conflicts with Yarion caused her to further and further isolate him from the duties of his job. Essentially, this is my point. Of which job? Of the chief deputy? Correct. So he became more and more marginalized. Which was an at-will position. Correct. So what has happened to him? It's the injury that was inflicted and the psychological injury that was inflicted. And that has to be assumed true for the purposes of this motion. But, okay, so what? Well, if you inflict... Sir, for substantive due process purposes... If a State actor inflicts an injury, intentionally, then that establishes under Lutherford a claim. What authority says that that amounts to a substantive due process violation? It was physical. In the circumstances where the employee is in an at-will position. Which he can get canned from or released from for any or no reason, whatever. So the release of him, I just don't... I guess I have a very difficult time seeing where this right comes from. Why don't we forget the at-will position? Let's just assume that the person was the lowest ranking... Let's forget it. Wait a second. But that's not significant for this claim that I'm explaining right now. The question is whether or not... Well, there's no interest in that job. I mean, there is no liberty interest. There's no property interest. I agree. There's no nothing kind of interest. I agree. I agree. So where's the claim? But the interest is in your bodily integrity as they explain the cases when they're dealing with physical injury. Does he have a physical injury? No. No, he has psychological injury. Well, you don't... What case do we have that says that if you don't think you're being treated nicely and so you have to see a counselor, that you've been denied substantive due process? Well, if you phrase it that way, that predetermines the outcome of the question. So what's the difference between what I just said and what you're arguing? The difference is that it's more comparable to the injury that we established, that was established, for instance, in the Sanchez case, where you had... If, in fact, it was necessary to go to evidence, there would have been demonstrable evidence of a pathological injury. There's a difference between, gee, I was really stressed out because I was very unhappy, and then a person having a stress disorder. People who have stress disorders, as reflected by the DSM, have a demonstrable injury. Now, unless we want to say that that creature doesn't exist under the Rutherford analysis, under a substantive due process analysis, that's fine. But the point is, is I am analogizing the Rutherford situation, saying that if you're capable of proving an actual pathological injury, let's say, hypothetically, you can prove that. It's not just I'm unhappy because I'm being treated unfairly. It's actually a demonstrable injury. Let's assume that you can establish something like a total nervous breakdown that a person had, so extreme that it's undisputable. Would that then be sufficient? Well, it might make it compensable for social security or something, but I don't know how it's an intentional infliction that rises to substantive due process. Well, I'm simply opining that if you can have an intentional infliction of a physical injury that is forbidden by substantive due process, then you can have an intentional infliction of an emotional injury, a psychological injury that is also forbidden, presuming you can meet the necessary burden of proof. And at the pleading stage, you don't have to prove. You just have to plead it properly. And we did. We pled that he had the necessary injury. In any event, that was the point that I tried to make with the Rutherford case. And this was the most direct questions that I got asked on it, by the way, in this entire case. It's the first time somebody even asked me to explain what I was just trying to say, even though we briefed this thing several times on the due process matter. Now, likewise, we argued that there was, we made a posit about the whole question of whether or not you can have an attempted constructive discharge. We've created an anomaly, sort of a beast, that says that with constructive discharge, we want you to hang around in spite of certain levels of egregious conduct until you can sort of make a rough estimate in your own mind that you probably have enough that a reasonable person would feel compelled to resign. What did he have that he felt compelled to resign? Now we're talking about when he's at the division chief. We're not talking about the chief deputy. We're talking about now when they put him, it's not just a physical location in Bixle. They essentially gave him meaningless duties. Again, these are our pleadings. This is what has to be presumed true. They gave him meaningless duties. And he stayed for four years and didn't leave. So where's the discharge part of constructive? He's staying to fight and asking for a court to help him stop them from doing it. But that's not a constructive discharge. I agree. Can there be an attempted constructive discharge? The reason being, what if, does a person have to roll the dice? Do they have to basically say, the courts say stand and fight. So I'm going to stand and fight and then I think now I've reached the moment when I think a court will agree with me that I should quit. You can probably sue for a hostile work environment. You can sue for all sorts of things if you wish to stay. But if you leave, then you've got a discharge. And so the question is, well, was I basically forced out or did I just want to quit? And do you have the ability to say instead, I want to try and seek a constructive discharge through equitable relief? Okay. If you want to reserve the rest of your time, you may. Yes. Morning. I'm Joel Clevens for Defendants and Appellates of County, Alternate Public Defender and Janice Foucault. I think plaintiff's argument here on due process concedes as he basically did in the brief,  that there is a law, a present law, that he'd like, Your Honors, to create law. That a public employee who alleges that he's suffering psychological injury because he doesn't get along with his boss and he doesn't like his duties, has a due process claim. No such case, so holds. As an aside, if there was or is a nepotistic relationship between the boss and her parent, the allegation is that, and someone whom she's now giving a lot more responsibility or relying on in the office, does that violate some sort of rule of the APD or the county or the supervisor? Absolutely not. And there was... So the county of LA permits nepotism. There was a deposition, although neither party cited it in their briefs, but there was a deposition taken by a plaintiff of the... I've forgotten his full title, but essentially the head of HR for the county, who was asked that question, whether there was a rule that precluded Janice Foucault from being a couple with Jordan Yerian for 20, 25 years, that they were couples that went back to the public defender's office before the alternate public defender was even created. And he testified that there was no such rule. And we looked, and there is no such rule in the county that precludes this relationship. And I think when we talk about the relationship, I think what counsel said was the fundamental fact or what were the important evidence is correct. In other words, what was the evidence that this relationship caused consequences that this court should care about? In other words, he alleged, plaintiff alleged, that because of this relationship, Jordan Yerian was the de facto APD, that he ran the office, that he wasn't competent to run the office, that the office was going down the tubes. That was the allegation. And then, of course, we took plaintiff's deposition and out of his own mouth, with respect to each and every claimed consequence, there was the admission that there was no evidence, that he had no evidence, that this was supposition. He admitted in his deposition that he had no basis for his claim that Yerian ran the office. He admitted that he had no basis for his claim that Yerian controlled all purchases in the office. He had no basis that Yerian was the de facto chief deputy of the APD. Are you conceding that that would violate some law? I beg your pardon? Are you conceding that if he had evidence it would violate some law? What I'm stating, no, what I'm stating is that this was a frivolous claim from the get-go. This was a plaintiff who was angry, who wanted to bring his, who wanted to exert his power and bring his personnel gripes to a court and turn them into a constitutional claim, a claimed constitutional claim and torture Janice Yerian Janice Yerian and, I'm sorry, Janice Foucault and Jordan Yerian as much as he could. And that's exactly what he's done for all this time. So he could have stayed in his chief deputy position? He was there and nobody asked him to leave although he was doing an abominable job. He happened to have a boss who valued avoidance of problems in the office and confrontation in the office over having a chief deputy who would do a good job. Every time he was given a supervisorial responsibility he screwed it up, he was insubordinate, he was rude, he was sullen, he made her life miserable and yet she didn't demand that he resign. He resigned. And then, of course, in that resignation meeting as your honors pointed out, it was he, she said, remain in your office. And it was he who said, no, I'm not going to remain in my office, put me in another office. And she said, you know, right now downtown we don't have a lot of offices. And he said, fine, send me to Bixel. And she said, I don't know if that's a great idea but I'll think about it. Ultimately, she agreed to do what he asked and she produced two emails which said at Mr. Carlton's request he's going to Bixel. Mr. Carlton forwarded those emails to others and never once said, I didn't request going to Bixel, that's not true. It is undisputed in this case that it was he who requested going to Bixel. Where is Bixel? It's a satellite office on Bixel Street which is just west of downtown and it's a satellite office of APD and obviously doesn't have How far is it from the center? It's actually not far from the main office but conceded it is It's the province not where the action is in the APD's office. The action is downtown. And he had a prime office downtown right next to Janice Foucault's office. And he said, I'm not staying here. Another exercise of his displeasure with his boss. So both the due process and equal protection claims had no basis whatever in the law and were dismissed as a matter of law. And then plaintiff was left with this First Amendment claim which was that he was retaliated against because of his exercise of claimed free speech. And the list that I was going through all of which is in the brief and I don't have to go through it further which established the things that plaintiff admitted in his deposition is so important because those facts that he alleged about Yarian running the office were the only facts that he alleged that arguably would take his claim out of a routine personnel gripe and turn it into something that at least he could argue was constitutional. In other words that he was talking about a matter of public concern and not simply whining about his duties and that he didn't like working for Janice Foucault. And so when he admitted in his deposition that there was no evidence for any of these consequences from the Yarian-Foucault relationship then what he was left with was his request for review which was his alleged speech and in that request for review he says I don't like my duties I don't like my boss I don't like my working environment. Exactly the opposite of what for example even in the dissent into Rocher was pointed out with respect to those individuals that they were not complaining about their own jobs they were seeking remedies that went that had nothing to do with their jobs had nothing to do with their job duties they were talking about policy changes in the police department Mr. Carlton is not talking about policy changes in the APD he's saying I don't like what's happened to me I don't like my job I don't like my job duties and yet and then he has to prove that the reason why his job duties were changed was to retaliate against him for his speech and yet the evidence which is exhaustive and overwhelming in the motion for some reason and none of which was responded to by the plaintiff in other words we produced 256 designations so so the evidence was overwhelming because Janice Foucault was so meticulous in documenting her reasons for her displeasure and just one last point they were all all of Janice Foucault's complaints were contemporaneous she didn't come up with these complaints after he alleged a constitutional claim she made them at the time and they were convincing they were honest this is all fully  and they explained why he is not chosen to be at executive committee meetings and he is not given supervisorial responsibilities thank you very much thank you he asked the question and I'm going to answer the question what was the impact of the nepotistic relationship that makes it an issue of importance to this court and probably there's this one page in the record that probably best describes it and that's at 397 of the excerpts and that is the testimony of Larry Paxton who was the division chief who essentially did what Mr. Carlton should have been doing when he was an acting division chief and he was an acting division chief at the time of the resignation of Mr. Carlton from deputy chief chief deputy excuse me now what that addressed was and I've discussed it in the brief but I think it's necessary to say that he had submitted his resignation on June 27th on June 29th they have a meeting in Miss Fukai's office she says to him and she admitted in her deposition she asked him to withdraw his resignation to stay this is notwithstanding the parade of horribles that had already happened all these terrible things he was a terrible chief deputy but she wanted him to stay she didn't intend to remove him was happy to have him stay in that job he says I'll go think about it on July 7th he submits his complaint to the board of supervisors and shortly after that she has this conversation with Mr. Thaxton which he describes as basically saying she's furious that he went to the county supervisors and her superiors about this she felt betrayed disloyal that she had tried to keep him in the job because she recognized there was a split within the department and Thaxton repeats that several times that she's trying to rectify a split within the department you can see what that split was all about in the declarations that we submitted in support of our opposition in which there was clearly a split now immediately after that she decides to accept his resignation predates it to June 28th back to the day before they had the meeting on June 29th and then takes him up on okay you know you don't want to be in your office as chief deputy the only office that's available like as if you can't switch offices around or see if people are willing to switch we'll send you the pixel which is symbolic of really the fact that he has not been a division chief since that moment doesn't attend the meetings of the executive committee doesn't participate in any manner shape or form collects a check as division chief and does a glorified clerical job now that makes it a matter of public interest it doesn't matter what his motives were because the cases on public interest use a sliding scale approach to it if you have something that is clearly in terms of the content is a matter of public concern then it doesn't matter what the motive of the employee is conversely it has to be purely a personal matter for it to be taken out of the First Amendment context finally I don't understand this causation argument that keeps being said I just explained a sequence which should be sufficient in and of itself to establish she wants him until he makes the complaint she doesn't want him after he makes the complaint we also showed how each of those separate charges and allegations that she was bootstrapping from earlier were also pretextual which is another basis to establish that there was causation and once again by showing the competing views of the same thing so we presented a considerable body of evidence beyond the declaration of Mr. Carlson Thank you The matter just argued is submitted for decision
judges: Schroeder, Rymer, Wardlaw